# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

## SAVANNAH DIVISION

| | | |
|---|---|---|
| JOHN HORTON and CAROLYN HORTON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CV412-127 |
| MAERSK LINE, LIMITED, and A.P. MOLLER-MAERSK A/S, | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

In this maritime personal injury case, defendant Maersk Line, Limited (Maersk) moves under Fed. R. Civ. P. 26(c) for an order to: (1) prevent plaintiffs' lead counsel, Brent Savage, from "re-abusing" a deposition witness; and (2) bar plaintiffs' use here of a prior state-court deposition of that same witness, lest they profit from Savage's misconduct during that deposition. Doc. 71.

## I. BACKGROUND

John Horton, a longshoreman, sued the Georgia Ports Authority (GPA) in state court. He alleged that a GPA cargo-crane operator's negligence partially caused injuries he sustained while unloading a

container on a vessel "operated, captained and crewed" by Maersk. Doc. 42 at 2 ¶ 7; doc. 71-3 at 2; doc. 81 at 2 (the state *GPA* lawsuit).[1]  In a second state court lawsuit (*Maersk*), since removed to this Court, Horton sued Maersk in negligence on the same incident.  Doc. 1-1; doc. 42.  Here he claims he was injured while unloading the ship, doc. 1-1 at 7 ¶ 7,[2] and he later added as a defendant the container's owner, A. P. Moller-Maersk A/S (APMM).  Doc. 1-1 at 6; doc. 42 at 1-2 ¶ 2.

The specific allegations of negligence figure into the protective order sought here.  Horton says he was injured when a "twist lock"[3] fell from a container that was suspended in the air.  Doc. 1-1 at 7 ¶¶ 5-12; doc. 56 at 3.  The "twistlock became dislodged after striking another object because the corner casting was in disrepair, having been shaved or

---

[1]  His wife also raised a consortium claim, but for simplicity's sake the Court will refer only to John Horton for the remainder of this order.

[2]  For this and all other documents the Court is citing only to the page numbers imprinted on the top of each page by the Court's docketing software, and not the individual manuscript pagination.

[3]  This is also called a "shoe" or "locking shoe."  Doc. 81-5 at 10; *see also* doc. 71 at 2 n. 2 ("Twist locks or 'shoes' are inserted in the four corners of containers by longshoremen working on the dock.  When a container is landed atop another container in the stow, the twist locks automatically lock and secure one container to another.").  Maersk, by the way, says it will show that the twist lock was in good working order.  Doc. 101 at 2.

cut by a welding torch.  [He] also contend[s] that [Maersk] conducted a deficient investigation into the cause of [his] injury, and . . . did not properly supervise loading."  Doc. 56 at 3-4; *see also* doc. 81 at 2 (claiming "the ship's crew failed to adequately direct and supervise the loading of the ship, and that the shipping container which housed the twist lock was defective.").

Defendants deny liability, doc. 56 at 4-5, insisting that Horton's own failure to heed safety rules caused his injuries.  Doc. 71 at 4.  The parties here have been conducting discovery, including depositions. During the *GPA* case they deposed longshoreman Christopher S. Morris, who had been working nearby when Horton was injured.  Doc. 81-5 at 8. A key fact in this case was whether Horton violated the "three-container" safety rule -- don't stand within three cargo containers of the area where a cargo unloading crane is "landing" or "taking off" cargo containers.  *Id.* at 8.  Morris, who did not see Horton get hit by what he called a loading "shoe" but who immediately rushed to his aid after it struck Horton in the head, *id.*, deposed that Horton "was *not* three containers away" when he was struck and injured.  *Id.* at 8 (emphasis added).  And a contemporaneous investigation, Maersk points out,

corroborates that testimony.  Doc. 71 at 2-3 (report showing that the largest pool of Horton's blood was found "directly underneath the container that lost a twist lock.").[4]

---

[4] The investigation, handwritten notes generated during that investigation, and the resulting typed report are confusingly referenced by Horton in his briefing.  The notes and report also drive a discovery abuse motion from Horton, which is addressed below.  Hence, it is necessary to indulge in a comprehensive explanation of how that accident report was generated.  Maersk explains it in a briefing passage that Horton does not dispute:

> Edward Hurley, the third officer on the [ship], explained the process of taking Mr. Morris's statement in his deposition. (Doc. 70-1 at 23-47). Mr. Horton was injured at approximately 1055 hours on March 18, 2011. Mr. Hurley noticed Mr. Horton leaving the vessel and learned he had been injured. He notified Rohit Malhotra, the Chief Officer, over the radio. He then proceeded to the catwalk between Bay 59 and Bay 62, aft of the accommodation house. Mr. Hurley viewed the scene of the accident and spoke with Chris Morris, the only person working with Mr. Horton at the time of his injury.

> At the instruction of Mr. Malhotra, who had joined him at Bay 59, Mr. Hurley went back into the cargo office and obtained a note pad. He returned to the scene and took notes while Mr. Morris described what happened. He then returned to the cargo office and typed a statement from these notes. Mr. Hurley again returned to the scene and presented the typed statement to Mr. Morris for his review. Mr. Morris reviewed the statement and signed it. Mr. Hurley had copies made, which he left with Mr. Malhotra, then went to his cabin to take a nap, as his watch was over at noon. Having typed the statement for Mr. Morris to sign or edit, as he saw fit, Mr. Hurley was simply following protocol. There was no "*handwritten statement*" by Mr. Morris, only Mr. Hurley's notes. These notes were not retained.

4

Morris' testimony didn't sit well with Brent Savage, Horton's lead counsel:

> MR. SAVAGE: I mean, he's already testified under oath [Horton] was more than three, but maybe --
>
> [GPA COUNSEL RON BOYTER]:  Right, yeah.  That's what I'm trying to figure out.
>
> THE WITNESS: No, he was directly under where we were loading.
>
> Q.  (By Mr. Boyter).  Okay.  All right.  So just to be clear, was Mr. Horton within three containers of the container being loaded?
>
> A. Yes. He was *not* three containers away.

Doc. 81-5 at 29-30 (emphasis added).

> [Savage]:  Okay.  What you're telling us is that Mr. Horton was at fault here?
>
> A.  That he was at fault?
>
> Q.  Uh-huh.
>
> A.  Yes.

---

> The testimony of Mr. Morris, Mr. Hurley and Mr. Malhotra is completely consistent on this point. The statement signed by Mr. Morris was created and executed within an hour of the incident, on board the vessel, in front of two witnesses, after Mr. Morris described to them what he had observed.

Doc. 87 at 2-3 (emphasis added).

Q.  Okay.  Now, let's talk about your experience here.  You know Mr. Horton?

A.  Yes.

Q.  Just look at him and tell him he's at fault.  It's your fault.

A.  It was your fault that day.

*Id.* at 36.

Morris further undercut Horton's case against *Maersk* when he explained how the crane operator's actions figured into Horton's injuries: "He eased it down and he -- he almost landed the forward end of the box and then was trying to land the aft end, and it hit the other end of the container.  The top of the other container he was loading on top of, it hit the edge of the container, hit the shoe and caused it to twist just a little bit.  When it caused it to twist, it fell out."  Doc. 81-5 at 7.  Horton notes that this testimony affixes liability onto the GPA while exonerating Maersk.[5]  Doc. 81 at 3-4.

Savage thus proceeded to question Morris' competency based on the fact that by that point in time Morris was new on the job.  That got him nowhere fast:

---

[5]  Maersk says Horton settled his case against GPA.  Doc. 101 at 2 n. 2.

Q.   Do you think you have the ability to say that he was at fault?  In other words, you've only got five months.

A.  Correct.  But even at five months, I know the rules of staying away from the containers.

Q.  Okay.

A.  I don't want to be hit with a shoe.

*Id.* at 36-37.

The deposition slid downhill from there.  It is laden with a continuous stream of snarky, accusatory questions and innuendos from Savage. *See, e.g., id.* at 26 (Q. (By Mr. Savage) Okay.  I mean, I don't get it. We've got a guy trying to ruin a guy's life here who doesn't -- do you feel bad about it?"); *id.* at 27 (Q. (By Mr. Savage) . . . Would you like to call your father-in-law or something as to whether you need a criminal lawyer, Mr. Morris?").  More such examples are reproduced below.

Wary of Savage's participation in the re-deposition of Morris here, Maersk filed the instant motion.  Emphasizing that Savage "engaged in bullying and belittling Mr. Morris with threats of contempt and criminal prosecution as well as insults to his integrity, his character, and his education," doc. 71 at 1, Maersk "respectfully requests that the Court issue a protective order preventing the use of Mr. Morris's previous

deposition for any purpose and protecting Mr. Morris from further abuse in his upcoming deposition." *Id.*[6] Here is an excerpt from Maersk's summary (using "minu-script" page cites, rather than docketing pagination cites) of Savage's "over the line" behavior:

> In an unrelenting effort to dissolve Mr. Morris's unfavorable testimony about [Horton's] lack of care, Mr. Savage threatened Mr. Morris, a 20-year-old man, with contempt or criminal prosecution no fewer than six separate times. (*See, e.g.*, Ex. A at 12) (Depo. pg. 47, lines 16-18) ("You're going to do what I say or I'll go to the judge and hold you in contempt. How about that?"); *id.* at 21 (pg. 83, lines 8-15) ("Q. Well, why do you feel comfortable coming in under oath-- I mean, you realize it's a crime to testify falsely under oath? A. Yes. Q. Okay. I mean, you would be guilty of perjury if you were testifying falsely under oath. A. (Nods head). Q. Mr. Schiavone knows better than me. What's that? A felony or a misdemeanor?   SCHIAVONE: Felony. MR. SAVAGE: You may want to get a criminal lawyer. Q. (By Mr. Savage) So you would be put in jail for testifying falsely under oath.); *id.* at 28 (pgs. 109-10, lines 24-28) ("MR. SAVAGE: I'm sick of people coming in trying to hurt people when they are testifying falsely. And I'm trying to be a nice guy to you saying you need a criminal lawyer. I've done this for 34 years, and I have not seen such disparate testimony ever in my life. And I'm going to refer this to the district attorney to indict you."); *id.* at 32 (pg. 127, lines 7-10) ("Q. (By Mr. Savage) Tell the district attorney in this deposition, Larry Chisholm, in Chatham County where you're testifying -- not in Effingham -- why he shouldn't indict you for perjury."); *id.* at 36 (pg. 141, lines 14-16)

---

[6]   Given the ethical accusation contained in Maersk's motion and brief, the Court stayed Morris's re-deposition until it could resolve this matter.  Doc. 77.

> ("MR. SAVAGE: If I can get an expedited copy [of the deposition]. I want to deliver it to the district attorney.").

Doc. 71 at 4-5 (footnotes omitted).   Maersk supplies pages of other, similar examples of Savage's questioning. *Id.* at 5-11.   His misbehavior, Maersk contends, was then exploited in succeeding depositions within this case:

> Fast forward to July 27, 2012, when Mr. Savage began his cross-examination of Mr. Morris, the purpose of which was to bully, threaten, and insult Mr. Morris, not only to keep him from giving testimony prejudicial to [Horton] sixteen months after the fact, but also, and more importantly, to attack the statement that Mr. Morris had given within an hour of the incident. Mr. Savage challenged Mr. Morris' memory of that day sixteen months earlier regarding matters which were not even at issue, such as the direction in which the vessel was headed and whether Bay 62 was in front or behind the accommodation house. On some of these issues Mr. Morris' memory was faulty. Not content to leave it at that, Mr. Savage continued with his unethical threats and insults in his effort to persuade Mr. Morris that he had all of his facts wrong. This inappropriate bullying of Mr. Morris culminated in the creation by Mr. Savage of an exhibit that read as follows:
>
> > "I was repeatedly wrong in my testimony incident today. 7/27/12. Chris Morris."
>
> (Doc. 71-4 at 2). *Mr. Savage signed Mr. Morris' name* to this exhibit. Mr. Morris did *not* sign it.
>
> Armed with this "new statement" of Mr. Morris from the GPA case, Mr. Savage then liberally infused [Horton's] case against Maersk and APMM with the falsehood that Mr. Morris had disavowed everything he had said in his type-written statement on

board the vessel. For example, in Mr. Malhotra's deposition, Mr. Savage introduced Mr. Morris' "new statement" by saying: "Let me show you something that he [Chris Morris] wrote out for me when he was deposed." (Doc. 70-2 at 15). After objections, Mr. Savage proceeded:

> Q. Were you aware that on July 27th, 2012, Mr. Morris *signed* a statement in his deposition *or agreed* with a statement in his deposition that he was repeatedly wrong in the testimony he had given about the John Horton incident today?

Doc. 87 at 3-4 (emphasis added). Maersk cites that as proof "that Mr. Savage's bullying was intended not only to discredit Mr. Morris, but also to provide a challenge to the testimony of Maersk's witnesses and 'facts' upon which the Plaintiff's expert witnesses could rely in giving their opinions." *Id.* at 4.

In satisfying his duty-to-confer requirement here,[7] Maersk's counsel wrote Savage and sought his agreement to bar use of the Morris deposition in this case, refrain from abusing Morris upon his re-deposition here, and adhere to Fed. R. Civ. P. 30(d)(2)[8] as well as the

---

[7] The duty to confer is mandatory and must be meaningful. *Scruggs v. International Paper Co.*, 2012 WL 1899405 at *1 (S.D. Ga. May 24, 2012).

[8] Rule 30(d)(2) of the Federal Rules of Civil Procedure provides that a "court may impose an appropriate sanction -- including the reasonable expenses and attorney's fees incurred by any party -- on a person who impedes, delays, or frustrates the fair

Georgia Bar Code's professionalism requirements.[9] *Id.* at 11; doc. 71-5.

Savage refused.  Doc. 71 at 12.  Finally, Maersk cites Savage's deposition

behavior in other cases, contending that he crossed the line there, so this

case is part of a pattern. *Id.* at 14-16; *see also* doc. 102; doc. 102-1.

## II. ANALYSIS

Maersk emphasizes that it is *not* seeking sanctions against Savage.

Instead, it wants only two forms of relief:

> First, Maersk seeks to prevent the intimidation that occurred in
> Morris's state court deposition from recurring in this case. Maersk
> specified four mandates that it believes would accomplish this goal.
> (Doc. 71 at 16-17).  Preventing such behavior from occurring in the
> future also requires that Mr. Savage not be allowed to benefit from

---

examination of the deponent." Fed. R. Civ. P. 30(d)(2); *see Facebook, Inc. v. Power
Ventures, Inc.*, 2013 WL 4049688 at *4 (N.D. Cal. Aug. 7, 2013) (awarding costs for a
renewed Fed. R. Civ. P. 30(b)(6) deposition necessitated by defendant's and its
representative's "discovery misconduct," which included "being unprepared, evasive
and argumentative" during the deposition).

[9]     *See* GA. RULE OF PROF'L CONDUCT 3.4(h) ("A lawyer shall not . . . present,
participate in presenting or threaten to present criminal charges solely to obtain an
advantage in a civil matter."); GA. RULE OF PROF'L CONDUCT 4.4 ("In representing a
client, a lawyer shall not use means that have no substantial purpose other than to
embarrass, delay, or burden a third person, or use methods of obtaining evidence that
violate the legal rights of such a person."). "Fair competition in the adversary system
is secured by prohibitions against destruction or concealment of evidence, improperly
influencing witnesses, obstructive tactics in discovery procedure, and the like." GA.
RULE OF PROF'L CONDUCT 3.4 cmt. 1.

his unethical behavior in Mr. Morris's state court deposition, at which undersigned counsel's presence was not permitted.

Accordingly, Maersk asks the Court as its second form of relief to keep [Horton] from using Mr. Morris's state court deposition for any purpose in this case. This includes use of the deposition for impeachment and introduction of the deposition for any other purpose. Essentially, Maersk seeks to start Mr. Morris's deposition over, free from threats and insults. Mr. Savage engaged in prohibited conduct in the state court deposition and should not be allowed to benefit from it.

Doc. 87 at 5.

Hence, it simply wants a muzzling order against any further attack-dog tactics, plus an *in limine* ruling to prevent Savage from exploiting what he's already done (i.e., bar use of the existing Morris deposition in this case).  Horton responds by enumerating what he claims to be Morris' "repeated false statements," which justified Savage's rigorous cross-examination.   Doc. 81 at 5.   And Maersk's motion is unaccompanied by a Morris affidavit, much less by any complaint by Morris himself. *Id.* at 6. Since Morris can be impeached at trial with or without his deposition, Horton contends, Maersk simply seeks to restrict that effort with the instant motion.  *Id.*  Too, Maersk is complaining of a prior-case (the *GPA*) deposition it did not attend (it was not a party to that case) and over which GPA's counsel did not object. *Id.* at 7.

Horton also cites a dispute over a hand-written statement (by Edward Hurley, the ship's third officer, not Morris, *see supra* n. 4) "thrown away by Defendant, Maersk," *id.* at 9, and insists Maersk's "true concern is Morris' prior testimony.  It was untruthful, inconsistent, and proves Morris is unreliable.  Defendant seeks to bolster its case by removing his hurdle."  *Id.* at 14.  Plus, Maersk waited for months and 11 depositions to go by before filing its motion, which raises doubt over its true concern here.  *Id.*

Maerks responds that even though it was not part of the GPA deposition, it has standing to seek relief now because Rule 26 allows any party to object.  Doc. 87 at 5-6.  And Maersk is not seeking an order to *withhold* testimony, but simply wants "an order requiring that Mr. Savage play by the rules of discovery and that he not be allowed to benefit from previous behavior in violation of those rules. Mr. Morris will be deposed in this case, and [Horton] will have the opportunity to question Mr. Morris at that time."  *Id.* at 7.

Questioning Maersk's motive, Horton further responds via formal motion to "dismiss" Maerk's protective-order motion.  Doc. 88.  He argues that "[u]nder [the] guise of protecting Christopher Morris from

'further abuse,' Maersk is in reality seeking to protect its own interest through the exclusion of critical evidence which contradicts its own version of the facts." *Id.* at 4 ¶ 12.   Maerks deems that motion "unfounded, unnecessary and meritless" because it simply rehashes Horton's prior opposition brief and thus constitutes a resource-wasting "motion" filed for "no proper purpose."  Doc. 93 at 1-3.

Firing back,[10] Horton insists that Morris "recanted critical elements of his *signed* statement.  The version of the incident depicted in the signed statement supports Maersk's defense in this action.  The fact that Morris, through sworn testimony given in the [GPA deposition], acknowledges that *his handwritten* statement[11] is not accurate, harms Maersk's defense of John Horton's serious neck injury."  Doc. 97 at 1 (emphasis & footnote added).[12]   Horton accuses Maersk of improper

---

[10]  Rarely is this Court required to consume so long a stream of briefs in a discovery dispute.

[11]  Horton elsewhere does not dispute that Morris did *not* sign the handwritten statement that Savage hand-wrote during Morris' deposition.  And there is no evidence that Morris signed *any* statement.  Horton otherwise cites to no such thing. The Court finds his assertion here, then, needlessly confusing if not misleading.  *See also* n. 4 *supra.*

[12]  The Court notes that Horton supplied no record cites to support these statements. This violates Local Rule 7.1(b) ("Every factual assertion in a motion, response, or

motives: "Maersk's motive in launching its attack on Plaintiffs' counsel cannot be disguised. It seeks to divert attention from the fact that it destroyed *the handwritten notes*[13] memorializing the *very first* conversation with one of the few eyewitnesses to the action. Through seeking to preclude use of Morris' sworn testimony, Maersk further seeks to sanitize the evidence and to present only its version of the facts." Doc. 97 at 1-2 (footnote and emphasis added).

Finally, Horton has filed, in "take that!" fashion, a second motion: "Plaintiff's Motion and Brief in Support on Discovery Abuses of Defendant Maersk Line, Limited." Doc. 98. Maersk vehemently opposes. Doc. 101. The Court will reach that in Part II(B) below.

## A. The Morris Re-deposition

In another maritime personal injury case where a party sought re-deposition in light of alleged attorney misconduct, the court reminded that:

---

brief shall be supported by a citation to the pertinent page in the existing record or in any affidavit, discovery material, or other evidence filed with the motion.").

[13] Here Horton references the handwritten, investigative notes detailed *supra,* n. 4.

"[t]he examination and cross-examination of a deponent proceed as they would at trial under the Federal Rules of Evidence." Rule 30(c)(1). "During the taking of a deposition the witness has, *in general*, the same rights and privileges as would a witness testifying in court at trial." 8A WRIGHT, MILLER, AND MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2113 (2d ed. 1994) (emphasis added); *Plaquemines Holdings, LLC v. CHS, Inc.*, No. 11–3149, 2013 WL 1526894, at *5–*6 (E.D. La. Apr.11, 2013) (citing WRIGHT, et al. at § 2113, and noting a "degree of pliability" in deposition settings).

*Thomas v. Rockin D Marine Services, LLC*, 2013 WL 2459217 at * 4 (E.D. La. June 6, 2013). Depositions *not* conducted "as they would at trial" are properly subjected to protective orders, if not Fed. R. Civ. P. 11 and other sanctions. Protective orders may be sought, as Maersk has done here, under Fed. R. Civ. P. 26(c). Under that rule a court, "upon good cause shown . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . ." Fed. R. Civ. P. 26(c). That good cause requirement places the burden on Maersk to show the necessity for a protective order. The rule "contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." Fed. R. Civ. P. 26(c)(5); *Soule v. RSC Equipment Rental, Inc.*, 2012 WL 5060059 at * 3 (E.D. La. Oct. 18, 2012).

Maersk has shown good cause to exclude the use of Morris' *GPA* deposition here, and to muzzle attorney Savage upon his re-deposition. For starters, all lawyers appearing before this Court must follow the Georgia Bar Code and professionalism standards, L.R. 83.5(d), and that includes cases imported from Georgia courts -- they apply the same Code. Next, "Federal Rule of Civil Procedure 30(d)(2) allows the court to impose a sanction (including reasonable attorney's fees and expenses) on a person who impedes, delays, or frustrates the fair examination of the deponent.'" *Mechanical Marketing, Inc. v. Sixxon Precision Machinery Co.*, 2013 WL 1563251 at * 2 (N.D. Cal. Apr. 12, 2013); *see also Plaquemines Holdings, LLC v. CHS, Inc.*, 2013 WL 1526894 at * 2 (E.D. La. Apr. 11, 2013).[14]

Savage unquestionably frustrated the fair examination of Morris with a barrage of arrogant, irrelevant, accusatory questions and caustic

---

[14]   To that end, the Rule 30(d)(2) sanction "may be imposed on a deponent *or attorney*. [Fed. R. Civ. P.] 30(d)(2). The Court further has the inherent power to assess sanctions where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46, 111 S. Ct. 2123, 115 L.Ed.2d 27 (1991)." *Whiting v. Hogan,* 2013 WL 1047012 at * 9 (D. Ariz. Mar. 14, 2013) (emphasis added).   "The full scope of sanctions available under Rule 30(d)(2) is not expressly described in the text of the rule." *Glick v. Molloy*, 2013 WL 140100 at * 2 (D. Mont. Jan. 10, 2013).

comments that no witness, let alone a young man with no legal training, should have to endure.  He constantly threatened Morris with a criminal prosecution (one reminder that the laws of perjury apply is quite enough) and peppered him with off-point questions such as this: "Q.  Just look at him and tell him he's at fault.  It's your fault."  Doc. 85-1 at 36. *id*. at 26 (Q.  (By Mr. Savage) Okay.  I mean, I don't get it. We've got a guy trying to ruin a guy's life here who doesn't -- do you feel bad about it?"); *id*. at 27 (Q. (By Mr. Savage) . . . Would you like to call your father-in-law or something as to whether you need a criminal lawyer, Mr. Morris?"); *id*. at 20 ("Q.  How can you in good conscience do this to this man?  I mean, you're wrong about so many things.").[15]

---

[15] And, there's this:

Q.  (By Mr. Savage): It looks like you've got  -- you have a religious medal around your neck?

A. Yes.

Q. Is false swearing something that you've been told not to do?

A. From what I -- from what I know, I'm -- I'm not lying.  If I -- If my memory is off, then it's off.

Q.  It has real consequences in this case, my friends, millions of dollars of consequences.  Are you prepared to say for this man's family -- how many kids you think he's got.  Four?

Finally, if a lawyer violates ethical and professional norms in deposing a witness -- especially an unrepresented lay witness -- ample public policy grounds exist to give standing to a party, whose claims or defenses may well be adversely impacted as a result, to object to

---

A.  I don't know, and I'm not trying to ruin anybody's life.

Q.  Well, you're doing it.

A.  I'm trying to be as honest as I can be, and I'm not -- I have nothing against Mr. Horton.

Q.  Well, you don't even know him.

A.  No.  I really don't besides working with him a couple times that I know.

Q.  Well, why do you feel comfortable coming in under oath -- I mean, you realize it's a crime to testify falsely under oath?

A.  Yes.

Q.  Okay.  I mean, you would be guilty of perjury if you were testifying falsely under oath.

A.  (Nods head).

Q.  Mr. Shiavone knows better than me.  What's that?  A felony or a misdemeanor?

MR. SHIAVONE: Felony.

Doc. 81-5 at 21; *see also id.* at 32 ("Q. What's your home address?  I'm going to send you some release forms.  I want to get your grades.  I want to see how many times you lied to me . . . .  Will you release your grades?"); *id.* at 33 ("Q.  How many false things do you think you've testified to this afternoon?"); *id.* at 35 ("Q.  How would you define the term perjury?  Do I have to get more than five things that you're wrong?  Or how would you testify to that?"); *id.* at 36 ([to the court reporter]: "Mr Savage: If I can get an expedited copy.  I want to deliver it to the district attorney.").

19

unprofessional if not abusive deposition questioning of another. *Cf.* *Coach, Inc. v. Hubert Keller, Inc.* 911 F.Supp.2d 1303, 1310-11 (S.D. Ga. Dec. 19, 2012) (reaching merits of motion filed by plaintiffs over deponent's refusal to answer a deposition question, even though the deponent was not a party to the case), cited in *South Louisiana Ethanol, L.L.C. v. Fireman's Fund Ins. Co.*, 2013 WL 1196604 at * 5 (E.D. La. Mar. 22, 2013); *Wheat v. First Third Bank*, 2013 WL 149740 at * 2 (S.D. Ohio Jan. 14, 2013) (sanctioning plaintiff's counsel for physically abusive and unprofessional conduct toward opposing counsel during a deposition), *sanction reduced on reconsideration*, 2013 WL 3050912 at * 1 (S.D. Ohio June 17, 2013).

It is of no moment that the protection sought here -- against manipulatively abusive, caustically unprofessional conduct -- reaches back to a pre-existing (the Morris *GPA*) deposition. It is undisputed that Horton intends to use that deposition in this case, and there is no assurance of any kind from attorney Savage that he will not repeat his over-the-top conduct. Indeed, he does not dispute *any* of the excerpts set forth above, as provided by Maersk. Nor does he dispute that the above-cited Bar Code provisions apply to him. It is true that Savage has a

20

"duty to use legal procedure for the fullest benefit of the client's cause." GA. RULE OF PROF'L CONDUCT R. 3.1 CMT. 1. But "while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). "The line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *United States v. Young*, 470 U.S. 1, 7 (1985). Savage unquestionably crossed the line into improper advocacy here. He repeatedly threatened the deponent (a young person of limited education) with criminal charges, berated and bullied him, offered his personal views about the merits of his client's cause, and implied that the deponent should change his testimony out of sympathy for Horton and his family.

Courts, for that matter, routinely rein in those who cross the line. *See, e.g.*, *Soule* 2012 WL 5060059 at * 3 ("The Court hereby terminates the deposition of Justin Williams, orders that future depositions be conducted in a professional manner, and enjoins the following conduct: (1) yelling or raising voices; (2) pounding on the table; (3) using a confrontational or argumentative tone or language; (4) accusing witnesses of lying, providing false testimony, or providing testimony that is not true; and (5) disrupting or cutting off witness responses.");

*Langston Corp. v. Standard Register Co.*, 95 F.R.D. 386, 388-90 (N.D. Ga. 1982) (corporate defendant was required to bear expense of re-taking of depositions of two of its officers because of manner in which defense counsel made objections at initial deposition, depriving plaintiff of fair opportunity to cross-examine two apparently important witnesses).  As Judge Easterbrook has noted, district courts should use their

> authority to maintain standards of civility and professionalism.  It is precisely when animosity runs high that playing by the rules is vital.  Rules of legal procedure are designed to defuse, or at least channel into set forms, the heated feelings that accompany much litigation.  Because depositions take place in law offices rather than courtrooms, adherence to professional standards is vital, for the judge has no direct means of control.

*Redwood v. Dobson*, 476 F.3d 462, 469-70 (7th Cir. 2007).  Courts do so because "[c]onduct that is not permissible in the courtroom during the questioning of a witness is ordinarily not permissible at a deposition." *Landers v. Kevin Gros Offshore, L.L.C.*, 2009 WL 2046587 at * 1 (E.D. La. July 13, 2009) (quotes omitted) (imposing sanctions after witness had been unsuccessfully deposed three times; counsel "interrupted the witness and would not let him complete his answer and provide his explanation. His tone of voice can best be described as yelling.  Many of

22

his questions were improper."), *cited in Plaquemines Holdings, LLC v. CHS, Inc.*, 2013 WL 1526894 at * 5 (E.D. La. Apr. 11, 2013) (ordering re-deposition in light of plaintiff's conduct that court found to have been "far in excess of what might be allowed at trial, and which plainly impeded the full and fair examination of [the deponent]. . . ."). [16]

---

[16] *See also Jackson v. Deen*, 2013 WL 4498672 at * 1 (S.D. Ga. Aug. 23, 2013) (requiring plaintiff's counsel to show cause why he should not be sanctioned, under Fed. R. Civ. P. 11(c), for, *inter alia*, twitter-announcing that he would be "'undressing' Defendant Deen during her upcoming deposition."), *later opinion*, 2013 WL 4517262 * 1 (S.D. Ga. Aug. 26, 2013) (retaining jurisdiction to pursue that matter despite dismissal per settlement); *later opinion*, 2013 WL 4517266 at * 1 (S.D. Ga. Aug. 26, 2013) (refusing to abandon sanctions hearing despite defense withdrawal of the disqualification motion that led to it); *Zottola v. Anesthesia Consultants of Savannah, P.C.*, 2012 WL 6824150 at * 5-6 (S.D. Ga. June 7, 2012) ("Yelling at deposition witnesses, harassing and embarrassing them with questions about highly sensitive matters irrelevant to the litigation, and rudely tossing a phone at opposing counsel in anger are all offensive behaviors that fall well outside the bounds of professional conduct. Such incivilities not only constitute conduct unbecoming a member of the bar but violate specific rules that govern the practice of law before this Court. The local rules specifically state that '[w]itnesses shall not be shouted at ... or otherwise abused.' LR 83.15. The bar rules prohibit 'conduct intended to disrupt a tribunal,' GA. RULE OF PROF'L CONDUCT 3.5(c); ABA MODEL RULE OF PROF'L CONDUCT 3.5(d) (with a comment defining 'tribunal' as including a deposition), and yelling at a witness or throwing a cell phone at opposing counsel certainly qualifies as disruptive behavior."); *id.* at * 7 (granting, as a sanction, re-deposition request with express limitations, including a directive that the "deposition must be videotaped at plaintiff's expense and at least two cameras must be employed, one focused on the witness and another on plaintiff's counsel.").

In addition to barring Horton from using Morris' first deposition for any reason in this case, the Court imposes the following restrictions upon Horton's counsel -- specifically Brent Savage -- upon Morris' re-deposition:

> 1. No threats or attempt to intimidate Morris in any manner, including but not limited to, threatening him with prosecution for perjury.
>
> 2. No question shall contain an opinion or narrative about what is fair to John Horton, much less what a wonderful person (family man, etc.) he is.
>
> 3. Morris shall otherwise be shown respect.  Questioning shall be free of insults and comments about his educational background, his employment, his parents, or any other aspect of his life.
>
> 4.  This second Morris deposition shall be at the expense of all attending parties, but it shall also be videotaped, and that extra (videotaping) expense shall be absorbed by Brent Savage personally, not his client.

*See also* doc. 102-1 at 2 (special order, issued in another Brent Savage case, as contained in an August 14, 2013 ruling upon a defense protective order motion filed there: "3.  Displays of anger or sarcasm are for juries and not depositions.  Anger or sarcasm shall not be displayed during a deposition.  4.  Questioning a witness about how he/she would feel if it was his/her mother is inappropriate.").

### B.  Horton's "Discovery Abuse" Motion

In Horton's "Motion and Brief in Support on Discovery Abuses of Defendant Maersk Line, Limited," doc. 98 at 1, he complains that he served Maersk with discovery on April 12, 2012 and requested "[a]ny and all accident records, reports, memoranda and emails relating to [Horton] in Defendant's possession. . . ." Doc. 98 at 2.  He also requested basically all other documentation and communications relating to the incident. *Id.* at 2-3.  But Maersk, he now complains, "failed to identify three (3) transmissions from the ship on the date of [John] Horton's injury. (See Exhibit 'A', attached)[.]  These transmissions were in the form of emails between the ship's Chief Officer (Rohit Malhotra) and J. Robbins. (*See* Exhibit "B", attached). 'J. Robbins' is believed to be Jennifer Robbins, Marine Personnel Claims Manager, Risk Management Department with Defendant, Maersk Line Limited." *Id.* at 3; *see also supra* n. 4.

Horton contends that Maersk waived its work-product privilege to withhold these documents because it improperly waited until July 19, 2013 to reveal these "anticipation of litigation" communications, all dated on the date Horton was injured, in a privilege log otherwise required by Rule 26(b)(5)(A) to have been disclosed long ago.  Doc. 98 at

3-5. Maersk says Horton's "Discovery Abuses" motion "is a thinly-veiled attempt to create a discovery dispute when none exists and an effort to have Maersk charged with 'abuses' that would somehow match in character the abuses that [Savage] has committed.  This motion should be denied. Maersk has 'hidden' no documents and waived no privileges." Doc. 101 at 1.

The Court agrees with Maersk.  Horton wanted photographs and various documents "relating to" or "connected with" his injury. Maersk's response was accompanied by standard objections against disclosure "to the extent" his requests sought privileged, mental impression or work-product material. Doc. 101 at 3; doc. 102-2 at 2.  For nearly a year, Horton made no complaint about that, nor requested anything further.  Doc. 101 at 3.  On July 9, 2013, he mentioned a "privilege log" during an expert witness' deposition, then email-requested it a few days later. *Id.*; doc. 98 at 3-4.  Those dates confirm that he never raised this matter until *after* Maersk filed the protective order motion addressed herein. Doc. 101 at 3. Maersk complied within a week. *Id.*

It is clear that this is a retaliatory motion, raised only after Maersk illuminated Savage's misconduct in its protective-order motion. For that matter, Maersk violated no rule by failing to disclose its privilege log[17] until asked. *Mitsui Sumitomo Ins. Co. v. Carbel, LLC*, 2011 WL 2682958 (S.D. Fla. Jul 11, 2011) ("no federal rule requires production of a privilege log (much less filing it with the court) or mandating waiver as the sanction for non-production or untimely production of a log."). Nor did this Court order production, only to encounter disobedience to same.

Finally, the investigator's notes qualify as work-product privilege. *See, e.g., F.T.C. v. Hope Now Modifications, LLC*, 2011 WL 2634029 at * 4 (D.N.J. July 5, 2011) (investigator's notes). And "a plaintiff who creates work-product material before hiring an attorney is still permitted to take advantage of the work-product doctrine." *Bahrami v. Price*, 2013 WL 3800093 at * 6 (N.D. Ga. July 19, 2013).

---

[17] "The purpose of a log is to permit the opposing party and the court to evaluate claims of privilege or work product protection." *Fleisher v. Phoenix Life Ins. Co.*, 2013 WL 42374 at * 3 (S.D.N.Y. Jan. 3, 2013).

Horton thus must show "substantial need" and "undue hardship" required for work product disclosure of the notes.[18]

In that regard, the substance of the notes were disclosed. Maersk has shown that the hand-written notes were lost or discarded but that a typed statement had been immediately generated from them, which Morris contemporaneously read and signed, has been questioned about, and can be questioned about again in his re-deposition. Doc. 101 at 13; doc. 70-1 at 43. Horton's "abuse" motion, then, is much ado about nothing. And because it is baseless, it is not necessary to reach Maersk's "Duty to Confer" defense, doc. 101 at 6-7.


## III. CONCLUSION

John Horton's motions to dismiss, for discovery abuse, and for oral argument are **DENIED**. Docs. 88, 91 & 98. Maersk's motion for a protective order is **GRANTED**. Doc. 71.

---

[18]   Once a party demonstrates that documents are protected by the work product doctrine, "the party seeking the privileged documents must demonstrate a substantial need for the work product materials and undue hardship in getting a substantial equivalent of the materials." *Bahrami*, 2013 WL 3800093 at * 5.

The previous stay of Christopher Morris' deposition (doc. 77) is lifted.  Discovery is extended for 30 days to permit the re-deposition of Mr. Morris.

**SO ORDERED** this 9th day of September, 2013.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA